SIDNEY B. AND VERA L. STERN, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 14176–78.     Filed September 21, 1981.

*Randall G. Dick*, for the petitioners.
*Alan Summers*, for the respondent.

HALL, *Judge*: In his notice of deficiency, respondent deter-
mined deficiencies in petitioners' income tax as follows:

| Year | Deficiency |
|------|-----------|
| 1971 | $1,551,956 |
| 1972 | 688,147 |
| 1973 | 55,647 |

By amended answers, respondent redetermined the deficiencies[1] as follows:

| Year | Deficiency |
|------|-----------|
| 1971 | $1,017,890 |
| 1972 | 1,407,734 |
| 1973 | 94,405 |

Due to concessions by the parties,[2] the remaining issue for decision is whether certain transactions between petitioners and two foreign situs trusts should be treated as sales in exchange for annuity payments, or as transfers in trust with petitioners retaining the requisite interests under sections 671[3] through 677. If the transactions are treated as sales, we must further decide whether the sales constitute "closed" transactions in the year of sale.

---

[1]Respondent argues alternative grounds for the deficiencies asserted. The deficiencies reflected in the text relate to respondent's theory that the private annuity transactions engaged in by petitioners constituted closed transactions. In the alternative, respondent contends such transactions were transfers subject to retained income rights. The deficiencies (as amended) asserted under this latter theory are as follows:

| Year | Deficiency |
|------|-----------|
| 1971 | $20,350 |
| 1972 | 755,766 |
| 1973 | 1,662,817 |

[2]In his statutory notice, respondent disallowed legal fees of $10,000, in 1971, and $19,594, in 1972, claiming that they constituted nondeductible capital expenditures. At trial, petitioners offered no evidence with respect to these legal fees. Respondent's reiteration of the disallowance in his brief solicited no response from petitioners in their reply brief. Based on these events, we assume that petitioners have conceded the nondeductibility of the above amounts. Even if we are wrong in this assumption, petitioners would not prevail because they have failed to carry their burden of proving entitlement to the deductions. Rule 142(a), Tax Court Rules of Practice and Procedure.

In addition to the concessions made by the parties, two issues were severed from this case by a Court order dated Dec. 5, 1979. Both of these issues involve the disallowance of distributive shares of partnership losses claimed by petitioners. The entitlement to these losses is presently being litigated in other cases. The parties have agreed that the decisions reached in those cases relative to the claimed partnership losses shall be binding for purposes of this case.

[3]All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

## FINDINGS OF FACT

Sidney B. and Vera L. Stern resided in Reno, Nev., at the time they filed their petition.[4]

In the early 1950's, petitioner founded Fireside Securities Corp. (Fireside), an industrial loan company. Under petitioner's direction, Fireside became very successful. On August 12, 1968, Fireside entered into a plan and agreement of merger with Teledyne, Inc., pursuant to which petitioner received approximately 130,000 shares of Teledyne common stock in exchange for his ownership interest in Fireside. The plan and agreement of merger also provided for the issuance of contingent shares of Teledyne common stock as additional consideration. These contingent shares were to be issued in April 1972 based on Fireside's net income for the period 1969 through 1971.[5]

In the spring of 1971, petitioner retained the services of Elliot Steinberg, a San Francisco attorney. At this time, petitioner contemplated resigning as Fireside's president and starting a new finance company. Steinberg, on petitioner's behalf, investigated a number of potential investments and performed legal research on the applicability of certain new statutes involving commercial finance companies. None of these ventures materialized and petitioner decided to remain with Fireside.

Steinberg also counseled petitioners regarding various estate planning alternatives available to them. As a result of these discussions, petitioners decided to transfer their Teledyne common stock to a foreign situs trust in exchange for a private annuity.[6] An integral part of this plan was the creation

---

[4]Sidney B. Stern will be referred to as petitioner and Vera L. Stern as Vera. Together they will be referred to as petitioners.

[5]As part of the merger, Teledyne hired petitioner to run Fireside. Petitioner retained this position until some time in 1972.

[6]The typical advantages sought by this arrangement include: (1) The receipt of a steady flow of income for the remainder of the annuitant's life; (2) the deferred recognition of the gain inherent in the property transferred by the annuitant; (3) the potential removal of the transferred property from the annuitant's gross estate (this depends on whether the annuitant dies before his actuarial life expectancy and whether he consumes or saves the annuity payments); (4) the potential elimination of estate tax on any future appreciation in the value of the transferred asset (or its proceeds if subsequently sold by the trust); (5) the inapplicability of any gift taxes or sec. 2035 problems (transfers in contemplation of death) if the annuity is for full and adequate consideration; and (6) the foreign trust's ability,

of a foreign trust (of which petitioners and their children were the beneficiaries) to receive the Teledyne stock.

The details for implementing petitioners' plan were left to Steinberg. Of primary concern to Steinberg was establishing the trust's foreign status. Steinberg believed that having a foreign trustee and a foreign settlor would suffice. At this time, Steinberg maintained a working relationship with World Banking Corp., Ltd. (Wobaco), a Bahamian bank formed in 1964 by a consortium of international banks. During 1971, Wobaco had a wholly owned Bahamian subsidiary, Wobaco Trust, Ltd. (Wobaco Trust (Bahamas)), which offered both corporate and private trust services. Wobaco subsequently established a Cayman Islands subsidiary, World Banking & Trust Corp. (Cayman), Ltd. (Wobaco Trust (Cayman)). (We will hereinafter refer to both subsidiaries as Wobaco Trust unless there is reason to designate the specific Wobaco subsidiary.)

In need of a settlor for the proposed trust, Steinberg asked petitioners if they had any relatives or personal friends who were nonresident aliens and who would be willing to establish a trust on their behalf. Petitioner recommended Peter Hylton, a Canadian attorney then practicing in the Cayman Islands.[7] A member of Steinberg's law firm contacted Hylton and asked him if he were willing to aid petitioners in the preparation of an off-shore trust. The assistance requested of Hylton included reviewing the trust instrument for compliance with foreign law and becoming the settlor of the trust.

Hylton and his law firm eventually agreed to serve as settlor of a Bahamian trust with Wobaco Trust as trustee. Hylton and his firm each contributed $2,500 to the trust which Hylton deposited with the Castle Trust Co., Cayman Islands, on September 20, 1971. On or about that date, Hylton signed a

---

depending upon the tax laws of the trust situs, to accumulate income free of tax in order to service the annuity payments. See Dale, "Foreign trusts now offer particular estate planning advantages," 36 J. Tax. 20 (1972); Ekman, "Private Annuities Revisited," 8 U. Miami Inst. on Estate Planning, ch. 74–11 (1975); Kanter, "New decisions delineate tests for foreign situs trust-private annuity transactions," 38 J. Tax. 82 (1973); Zaritsky, "The Use of Private Annuities in Estate Planning: Problems, Opportunities, and a Viable Alternative," 32 S.C. L. Rev. 359 (1980).

[7]Petitioners and Hylton met unexpectedly in the lounge of a Miami Beach hotel in 1969. During the course of their conversation, Hylton explained the nature of his work in the Cayman Islands and how he expected the area to become a major tax haven. When petitioners suggested Hylton's name to Steinberg, they had not seen nor heard from Hylton since that time in Miami.

deed of settlement establishing an irrevocable trust (hereinafter referred to as the Hylton Trust) for the benefit of petitioners and their children.[8] Neither Hylton nor his firm was reimbursed for the $5,000 contributed to the Hylton Trust. Both Hylton and his firm viewed the amount as an investment, with the expectation that it would generate future business for the firm.

Castle Trust Co. held the $5,000 for the account of Wobaco Trust until November 23, 1971, at which time it remitted the funds to Wobaco Trust. Although its trust records reflect the receipt of this amount in 1971, Wobaco Trust did not sign the deed of settlement for the Hylton Trust until April 1972.

The executed deed of settlement provided, in pertinent part, the following:

Now THIS DEED WITNESSETH and it is hereby declared as follows

I     In these presents where the context so admits the following expressions shall have the meanings hereby indicated to them respectively

(A)  "Trust Fund" shall mean the cash or property received initially by the Trustee with respect to the trust created * * * [sic] hereunder and such further additions as may be transferred to it from time to time to be held upon such trusts or trusts including all monies and property investments and re-investments thereof * * *

   *  *  *  *  *  *  *

(D)  "Beneficiary" shall mean the person or persons for the time being to whom the Trustee is directed or authorised [sic] to distribute income or capital of the Trust Fund hereunder and the beneficiaries of the trust created hereunder shall be Sidney B Stern his spouse and the issue of Sidney B Stern born alive and living from time to time

   *  *  *  *  *  *  *

VI     The Trustee shall stand possessed of the Trust Fund of the trust created hereunder and of the income therefrom upon the following

(A)(i)  the Trustee shall pay the income of each trust held hereunder to the beneficiary or to any one or more of the beneficiaries thereof at any time or from time to time in any such amount as the Trustee in its absolute discretion shall see fit for the best interests or for the welfare care and comfort of such beneficiary or beneficiaries

(ii)  all or any part of the residue of the income of the trust which shall not be distributed to the beneficiaries thereof shall be distributed by the Trustee not less frequently than annually to a separate trust to be known as the Income Account of which such distributions shall comprise the capital and

---

[8]Although the deed of settlement recites that Hylton is the settlor of the trust, numerous subsequent correspondence signed by the trustee refer to the trust as the "Stern Settlement."

which shall be held by the Trustee for the benefit of the beneficiaries hereof subject to all of the provisions hereof including this Paragraph VI(A)

(iii)   all or any part of the residue of the income of any other trust held hereunder (including the Income Account itself) which shall not be distributed to the beneficiary or beneficiaries thereof shall be accumulated and added to the Trust Fund of such trust and shall for all purposes be treated as an accretion to the capital of such Trust Fund to be held administered and distributed as a part thereof

(B)   Notwithstanding the trust hereby created Sidney Stern shall have during his lifetime and upon the death of Sidney B Stern his spouse shall during the Trust Period have a power of appointment over the Trust Fund or any part thereof exercisable by Deed at any time and from time to time or by Last Will and Testament upon notice or receipt whereof the Trustee shall forthwith pay apply or distribute such amounts or properties to or for the benefit of such persons or trusts as such Deed or Will shall designate and direct (subject to the provisions of Paragraph VIII)[9]

VII   The following provisions are made with respect to the powers and restrictions relating to the beneficiaries hereunder

\*        \*        \*        \*        \*        \*        \*

(B)   Sidney B Stern during his lifetime and upon his death the surviving spouse of Sidney B Stern during her lifetime and upon her death the beneficiary for the time being or anyone have the power to act for him or if there shall be more than one beneficiary the beneficiaries jointly and unanimously of each separate trust hereunder may remove any Trustee thereof with or without cause by delivering to the said Trustee a written instrument signed by such beneficiary or beneficiaries provided that such written instrument shall concurrently appoint a successor trustee as hereinafter provided[10]

\*        \*        \*        \*        \*        \*        \*

X   Notwithstanding the trusts and provisions in this Deed herein declared and contained the Trustee may with respect to any separate trust hereunder at any time or times during the Trust Period if in its absolute discretion it shall so think fit raise any sum or sums out of the capital of the Trust Fund of such trust and pay or apply the same to or for the benefit of any beneficiary thereof exclusive of any other or others of the remaindermen and in such respective amounts if more than one and generally in such manner as the Trustee shall deem fit

---

[9]Par. VIII(C) provides that the power of appointment shall be a limited power of appointment, i.e., the power may not be exercised directly or indirectly in favor of the donee, his estate, his creditors, or the creditors of his estate. Par. VIII(A) further provides that "the donee of such power may make appointments outright or to a trustee or trustees to hold in trust for the exclusive benefit of any one or more of the objects of the power."

[10]Subpar. (C) of art. VII requires the successor trustee to be a company empowered to administer trusts and having authorized capital of at least $100,000 in Bahamian currency.

*     *     *     *     *     *     *

XII   The following provisions are made relating to the powers duties and privileges of the Trustee and the restrictions imposed upon him

(A)   Without prejudice to any powers which may expressly or by implication be vested in the Trustee under the provisions hereof and by law the Trustee shall have the following additional powers with respect to each separate trust

(i)  to make any division or distribution of the Trust Fund in favour of any beneficiary in kind or partly in kind and partly in money and to determine the value of any property so divided or distributed

*     *     *     *     *     *     *

(iv)  to sell or to offer to sell for cash credit or installments at public or private sale to grant options to purchase and to convey or exchange any and all of the property at any time forming a part of the Trust Fund or any life estate term of years remainder or reversion therein for such price including property of equivalent value (whether or not of like kind or similar use and including life estates terms of years remainders or reversions) and upon such terms as the Trustee shall determine

*     *     *     *     *     *     *

(vi) to borrow money from any person including the Trustee to extend or renew any existing indebtedness and to mortgage or pledge any property at any time forming a part of the Trust Fund to guarantee payment of any loan from a third person to a beneficiary or to a partnership of which a beneficiary or the trust is a general or limited partner and to pledge or hypothecate all or any part of the Trust Fund as collateral for such guarantee

*     *     *     *     *     *     *

(x) to purchase or otherwise acquire or to invest reinvest or refrain from investing the Trust Fund wholly or partially in common stock or in any other securities or other type or types of assets * * *

(xi) to determine as the Trustee shall consider just whether all monies shall for the purposes of these presents be considered as capital or income of the Trust Fund and whether out of capital or income any taxes expenses outgoings or losses shall or ought to be paid or borne * * *

*     *     *     *     *     *     *

(xiii) to vote or refrain from voting any corporate stock either in person or by general or limited proxy for any purpose including without limiting the generality of the foregoing for the purpose of electing any Trustee or beneficiary as a director of any such corporation * * *

*     *     *     *     *     *     *

(xvi) to lend the capital or income of the Trust Fund of a separate trust to a beneficiary of such trust without interest and without security or to make loans to or guarantee loans by any other person partnership corporation trust or estate upon such terms as the Trustee may deem advisable * * *

*     *     *     *     *     *     *

(xviii)  to secure from any beneficiary a full and complete release from any and all liabilities whatever attributable to any acts by the Trustee or

any decisions by the Trustee to act or to refrain from acting in any manner whatsoever with respect to the investments of the assets of the Trust Fund retention of any or all trust assets * * * [11]

On October 12, 1971, petitioner, his son, Steinberg, and a representative of Wobaco Trust attended a meeting in San Francisco, Calif. The parties discussed the transfer of Teledyne shares held by petitioners to the Hylton Trust in exchange for lifetime annuities. Various other matters were also discussed, including the trust's investment policy, the fees to be paid by the trust to Wobaco Trust for its administrative services, and the eventual removal of the trust to the Cayman Islands.[12]

The parties contemplated that the trust would sell the Teledyne stock and invest one-half of the proceeds in a quoted security on the New York Stock Exchange, and the balance in high income yielding securities.[13] A memorandum of the October 12 meeting prepared by the trustee's representative elaborated further on this point:

It will possibly not be required for the trustees to deal with all the investments since the 50% for re-investment in one quoted security on the New York Stock Exchange will be dealt with upon the advice of Mr. Sidney Stern.

On October 14, 1971, petitioners entered into a sales agreement with Wobaco Trust, acting in its capacity as trustee of the Hylton Trust,[14] pursuant to which petitioner transferred 126,867 common shares of Teledyne to the trust in exchange for the trust's promise to pay him a yearly single-life annuity of $222,757.01. Similarly, Vera transferred 17,136 common shares of Teledyne to the trust in exchange for a yearly single-life annuity to her of $27,216.85. The agreement provided for payments on both annuities to commence on October 14, 1972. The annual payments were computed using the fair market

[11]The trust instrument also empowers the trustee to pay premiums for life insurance on the lives of the beneficiaries.

[12]Although the Hylton Trust was established as a Bahamian trust, petitioner required that it be removed to the Cayman Islands upon the formation of Wobaco's new Cayman Islands subsidiary.

[13]During the years in issue, Teledyne paid no cash dividends to its shareholders but rather issued stock dividends.

[14]The Oct. 14, 1971, agreement was modified as of Mar. 21, 1972. The changes reflected in the modification agreement are minor in nature. Accordingly, all future references to the Oct. 14 agreement will be to the agreement as modified.

value of the Teledyne stock as of October 14, 1971, and the annuity factors published in table A(1) of section 20.2031–10(f), Estate Tax Regs.[15]

Under the October 14 agreement, the trust obligated itself to pay the annual annuities regardless of the value of the properties held by it and regardless of the amount of income produced by the trust. The trust's liability, however, extended only to the assets it held. If those assets were exhausted, Wobaco Trust, as trustee, was not obligated to make any further payments. The payments to be received under the agreement are assignable. The agreement also contains a default acceleration clause and a confession of judgment clause.[16]

Some time prior to December 7, 1971, petitioner suggested to Wobaco Trust that the Hylton Trust invest in a second mortgage company located in the United States. Petitioner intended to operate the company if the trust acquired it. To finance the proposed acquisition, petitioner recommended that the trust borrow $1 million using the Teledyne stock as collateral. Wobaco Trust approached Wobaco's loan committee with such a request. Even though the loan request received

---

[15]The annual payments were computed by dividing the fair market value of the Teledyne stock by the appropriate annuity factor listed in table A(1) of sec. 20.2031–10(f), Estate Tax Regs. The annuity factor in table A(1) imputes a 6-percent interest factor.

[16]These clauses provide, as follows:

"Any annuity payment not made by Purchaser hereunder when due shall accumulate interest at the rate of seven per cent (7%) per annum until paid, and such unpaid installment or installments shall constitute a liability of Purchaser immediately due and payable in addition to its obligations to make the above specified regular annual payments solely for the lives of the Sellers.

"The Purchaser agrees that in the event of default in annuity payments for three (3) successive years the "default amount" shall be due and owing on, demand. The phrase "default amount" with respect to each Seller shall mean for purposes of this Agreement, the worth of such Sellers receiving an annual annuity in the sum certain for the full term of his anticipated life as of the date on which the first unpaid sum certain was to be paid, to be determined from Table I of Regulations covering Federal estate taxes, or other such tables as are issued from time to time by the United States Treasury Department.

"The Purchaser authorizes any attorney at law to appear for it in any suit upon this Agreement in any court of record within or without the United States or the Bahamas after such default, does hereby waive and agree to waive issuance and service or process in such suit, authorizes such attorney at law to confess judgment in. favor of each Seller in the amount demanded, together with costs of suit, authorizes the enforcement of said judgment forthwith by any court within the United States having competent jurisdiction and authorizes the acceptance of service in the United States by and on behalf of the Purchaser."

preliminary approval, the proposed investment was never consummated.[17]

The Hylton Trust changed its situs to the Cayman Islands as of March 28, 1972, in accordance with petitioner's earlier demand. This change was effected by the resignation of Wobaco Trust (Bahamas) as trustee and the appointment by petitioner of Wobaco Trust (Cayman) as the successor trustee. Despite the change of trustees, the records of the Hylton Trust continued to be maintained by Wobaco Trust (Bahamas) until some time in February 1973.

In 1972, petitioner asked his father-in-law, Herbert Florcken, to establish a $1,000 trust for the benefit of Vera and their children. Florcken never questioned his son-in-law as to why he wanted the trust. On May 17, 1972, Florcken executed a deed of settlement establishing a trust with Wobaco Trust as trustee. Florcken contributed $1,000 to the trust. The material provisions of the trust (hereinafter referred to as the Florcken Trust) generally mirrored those of the Hylton Trust. The major differences were that the Florcken Trust named Vera and her children as the beneficiaries, and the lifetime and testamentary special power of appointment was held by Vera.[18]

On or about June 29, 1972, petitioner entered into an agreement with Wobaco Trust, on behalf of the Florcken Trust, whereby he transferred 136,850 shares of Teledyne stock in exchange for a lifetime annual annuity of $227,924.33.[19] These shares constituted the contingent consideration received as a result of the 1968 Fireside-Teledyne merger. Payment of the annuity was scheduled to commence on June 29, 1973. Petitioner, however, never received any payments pursuant to this agreement during the years in issue.

---

[17]The record does not disclose why the plan was abandoned.

[18]In 1972, Florcken filed the following tax and informational returns with the Internal Revenue Service and the State of California: (1) Form 3520—Creation of or Transfers to Certain Foreign Trusts; (2) Form 3770—Interest Equalization Quarterly Tax Return; (3) Form 709—United States Quarterly Gift Tax Return; and (4) Donor's Quarterly Tax Return (California).

[19]Steinberg advised that the stock be transferred to a second trust rather than to the Hylton Trust because of his concern that multiple annuities engaged in by the same trust might jeopardize the second annuity's characterization as a private annuity.

On September 1, 1972, the trust department of the Bank of America located in San Francisco, Calif., received 136,850 shares of Teledyne stock which it credited to Wobaco Trust's custodian account. On September 12, 1972, the record ownership of these shares was changed from petitioner's name to that of North & Co., Bank of America's nominee name.

Sometime after June 29, 1972, petitioner entered into an agreement dated September 15, 1972 (the September 15 agreement), with Wobaco Trust, on behalf of the Florcken Trust, which apparently supplanted the June 29 agreement.[20] This latter agreement provides for a $203,519.83 per year annuity to commence on September 15, 1975, in exchange for 136,850 shares of Teledyne stock.[21] Except as noted, the

[20]The record does not disclose why the June 29 agreement was rescinded. Respondent alleges that the June 29 agreement was rescinded because petitioners did not need the additional income. There is no evidence in the record to confirm or refute this allegation.

[21]At trial, petitioner and his counsel adamantly denied the existence of any June 29, 1972, annuity agreement. They insisted that the Sept. 15 agreement was the only one ever executed. Despite the fact that the record does not contain the original or a copy of the June 29 agreement, we believe that such an agreement did exist. We base this conclusion on the following considerations:

(1) Several pieces of correspondence between Steinberg and Wobaco Trust involve the execution of a June 29, 1972, agreement. The first of these, dated June 30, 1972, from Steinberg to Wobaco Trust states:

"Enclosed please find three copies of the Annuity Agreement between Sidney Stern and [Wobaco Trust]. I would appreciate your executing all three copies and returning two of the executed copies to me at your earliest convenience. *The certificates are in the process of being transferred to you.* [Emphasis added.]"

In early August 1972, Wobaco Trust returned two executed copies of the agreement to Steinberg.

(2) A June 29, 1972 entry made in the records of the Florcken Trust reflects the receipt of Teledyne stock valued at $2,583,043.70. On June 29, 1972, Teledyne's lowest trading price on the New York Stock Exchange was $18⅞ per share. Multiplying this figure times 136,850 shares yields an aggregate value of $2,583,043.75.

(3) Numerous pieces of correspondence from Wobaco Trust to the investment adviser for the Florcken Trust refer to the trust's need for liquidity in order to meet a June 29, 1973, annuity payment of $227,924.33. These letters are dated as late as June 1, 1973.

(4) An annuity calculation using the annuity factors published in table A(1) of sec. 20.2031–10(f), Estate Tax Regs., petitioner's age as of June 29, 1972, and the fair market value of the Teledyne stock as of that date, i.e., using the same method of calculation used to compute the annuity payments due from the Hylton Trust, yields an annual payment of $227,924.33. This is the same amount referred to in Wobaco Trust's correspondence with the trust's investment adviser. See (3) above.

(5) Certain Wobaco Trust documents dated after Sept. 15, 1972, indicate that the total annual annuity payments due currently are approximately $600,000. If indeed the Sept. 15 agreement were the only one, these documents should have reflected the 3-year deferred commencement date of the annuity due from the Florcken Trust.

Although petitioner concedes that the evidence lends some support to the proposition that "the parties contemplated entering into an annuity agreement on or about June 29, 1972,"

provisions of the September 15 agreement are substantially the same as those set forth in the October 14, 1971, agreement involving the Hylton Trust.[22] In a modification agreement dated September 5, 1975, petitioner and Canadian Imperial Bank of Commerce Trust Co. (Cayman), Ltd.,[23] agreed to postpone the first annuity payment until September 15, 1980. The modification agreement correspondingly increased the annual payments to $374,526.25 in order to account for the later starting date.

As previously mentioned, petitioner contemplated starting a new finance company in 1971. To facilitate this possibility, articles of incorporation were filed with the State of California on January 18, 1971, on behalf of Statewide Thrift. The company's stated purpose was to engage primarily in lending money and related financial activities. On August 15, 1972, the articles of incorporation were amended to change the corporation's name to Statewide Loan Co. As of August 15, 1972, no shares of Statewide Loan Co. were issued or outstanding. On February 1, 1973, the articles of incorporation were once again amended, this time changing the company's name to Phoenix Financial Corp. (Phoenix Financial).[24]

On August 22, 1972, petitioner, as president of Phoenix Financial, filed a personal property broker license application with the State of California. The application listed petitioner

---

he claims that no such agreement was ever executed. In support of this assertion, petitioner relies on the following: (a) The absence in the record of a June 29, 1972, agreement; (b) his own testimony and that of Steinberg denying the existence of a June 29 agreement; and (c) the receipt of the 136,850 shares of Teledyne stock by the trustee on Sept. 1, 1972.

We find these factors unpersuasive. First, we do not believe petitioner's and Steinberg's testimony on this point. Second, the unexplained absence of the actual agreement does not negate the evidence of its existence cited above. Third, it is unreasonable to think that the trustee's records and the correspondence all pertain to a nonexistent agreement. Finally, we attach no significance to the subsequent transfer date of the stock. Petitioner would have us believe that the Sept. 1 stock transfer was in anticipation of executing the Sept. 15 agreement. In light of the above, we find this explanation dubious. Rather, it appears more plausible to us that the September transfer date merely represented a delay in carrying out the June 29 agreement. See the underlined portion of the June 30, 1972, letter quoted in (1) above.

[22]The Sept. 15 agreement accounted for the delayed commencement date by increasing the fair market value of the Teledyne stock by 6 percent per year for each year of delay. This, in turn, increased the numerator of the fraction used to calculate the annual payments.

[23]Canadian Imperial Bank of Commerce Trust Co. (Cayman), Ltd., replaced Wobaco Trust as trustee of both trusts in 1973.

[24]Any reference to Phoenix Financial will incorporate its predecessors.

and Vera as two of the company's three directors. The application also stated that Phoenix Financial expected to raise capital by selling all of its authorized stock to Lori Enterprises, a Delaware corporation wholly owned by the Stern family interests.

In connection with the above application, petitioners filed a personal financial statement with the commissioner of corporations, State of California. The financial statement is dated as of July 24, 1972, and is signed by petitioner and Vera. On this statement, petitioner valued his personal assets at $6,526,150. Petitioner listed Teledyne stock worth $5,900,000 among these assets. The financial statement contains no reference to any annuities.

On October 2, 1972, Steinberg placed a conference call to the Bahamas connecting himself, petitioner, and Charles Vaughan-Johnson, an officer of Wobaco Trust.[25] The purpose of the telephone call was to propose an investment to the trustees of the Florcken and Hylton Trusts. The nature of the proposed investment is reflected in the following memorandum prepared by Vaughan-Johnson:

> The proposal involves the purchase of 40% to 50% of the voting stock at a cost of approximately $600,000 U.S. currency of Western Independent Company traded over the counter.
>
> Western Independent Company owns California Thrift and Loan Company in the secondary loan market.
>
> It is understood that California Canadian Bank, a subsidiary of Canadian Imperial Bank of Commerce in San Francisco is willing to lend funds against the security of the Teledyne stock owned by the trusts at between one-half to three-quarters over the U.S. prime which would enable the trustees to make the investment in Western Independent Company.
>
> In due course, it is suggested that Mr. Stern be permitted to set up a new company to enter into a different kind of loan business in the secondary market in addition to the trustees purchasing Western Independent and that in due course, Mr. Stern could be engaged to act as adviser to both companies.[26]

---

[25]Between 1971 and 1973, Vaughan-Johnson was managing director of Wobaco Trust (Bahamas) and vice president of Wobaco Trust (Cayman).

[26]Neither the Hylton nor the Florcken Trust ever invested in Western Independent. The record contains no explanation why this proposed acquisition was abandoned. Testimony at trial, however, did indicate the investment may have been abandoned because of something petitioner said to the trustee.

Following the above conference telephone call, Vaughan-Johnson sent a Telex to Michael Nash, the Wobaco Trust representative handling the trusts. The text of the Telex states:

WE HAVE RECEIVED A REC OMMENDATION [sic] FROM STEINBERG ON ADVICE FROM STERN ON SUBSTANTIAL INVESTMENT IN TRADED OVER COUNTER STOCK OF WESTERN INDEPENDENT COMPANY TO OBTAIN EFFECTIVE CONTROL AT COST APPROXIMATELY DLRS US 600,000. WESTERN INDEPENDENT CONTROLS CALIFORNIA THRIFT AND LOAN COMPANY DOING BUSINESS SIMILAR TO SOURCE OF STERN's FIRST EIGHT MILLION SO WE ACKNOWLEDGE HIS PROFICIENCY IN THIS FIELD.

STEINBERG SUGGESTS TRUSTEES CONSIDER BORROWING AGAINST SECURITY OF TELEDYNE IN BOTH TRUSTS CURRENT VALUE DLRS 8 MILLION TO COVER INVESTMENT AND TO PROVIDE PAYMENT DUE OCTOBER 14 ON HYLTON TRUST ANNUITY OF ABOUT US DLRS 250,000 MAKING US DLRS 850,000 IN ALL. APPARENTLY CALIFORNIA CANADIAN BANK SUBSIDIARY IN SAN FRANCISCO OF CIBC WILL LEND TO TRUSTS AT ONE HALF TO THREE QUARTERS OVER U.S. PRIME ON SECURITIES OF TELEDYNE. STERN, ACTING IN ADVISORY CAPACITY, IS NEGOTIATING WITH THEM.

EYE [sic] PROPOSE TO GO TO SAN FRANCISCO TUESDAY OCTOBER 17TH TO DISCUSS WITH ALL PARTIES CONCERNED. TRUST DEED GIVES US NECESSARY POWERS, BOTH TO BORROW AND TO MAKE INVESTMENT, BUT EYE [sic] HAVE TOLD STERN THAT DESPITE HIS VERY OBVIOUS EXPERTISE IN THIS FIELD ESSENTIAL TRUSTEES SATISFY THEMSELVES ON PROPER NATURE OF INVESTMENT.

INVESTMENT CAN BE MADE OUT OF EITHER HYLTON TRUST OR FLORKEN [sic] TRUST OR BOTH.

MY INTENTION IS TO HAVE YOU APPOINTED A DIRECTOR OF WESTERN INDEPENDENT AND ITS SUBSIDIARY TO PROVIDE REGULAR AND EFFECTIVE SUPERVISION OF THE COMPANY IN CALIFORNIA, WHICH WOULD INVOLVE REGULAR BOARD MEETINGS IN CALIFORNIA.

DO YOU AGREE IN PRINCIPLE WITH INVESTMENT, TO APPOINTMENT OF STERN AS INVESTMENT ADVISER TO THE TRUST AND TO WESTERN INDEPENDENT COMPANY AND YOURSELF AS DIRECTOR OF WESTERN AND SUBSIDIARY?

Further conversations between Wobaco Trust, Steinberg, and petitioner occurred between October 2 and October 9, 1972. As a result of these conversations, the parties decided upon the corporate structure to be used to facilitate petitioner's reentry into the loan business. The plan called for Wobaco

Trust to borrow $25,000 to acquire all the outstanding stock of a recently formed holding company, Lori Enterprises, Inc.[27] In turn, Lori Enterprises would use the $25,000 to acquire all the outstanding stock of Phoenix Financial.

On October 16, 1972, Wobaco Trust, as trustee of the Hylton Trust, borrowed $285,000 from Wobaco. The loan was for 1 year at an annual interest rate of $8\frac{1}{8}$ percent. Wobaco Trust used the loan proceeds (1) to pay petitioners the annuity payments due on October 14, 1972 (approximately $250,000), (2) to purchase the outstanding stock of Lori Enterprises and Phoenix Financial ($25,000),[28] and (3) to pay for trust administration expenses (approximately $10,000). Checks for the annuities and the stock subscription price were issued on October 16, 1972.

Sometime between October 17 and October 24, 1972, Nash and David Rounce, a fellow employee of Wobaco Trust, traveled to San Francisco to confer with Steinberg and petitioners regarding petitioner's proposed new venture. An October 24 memorandum prepared by Rounce recounts the discussions at the meeting:

> The purpose of the meeting was to enable the trustees to hear at first hand how the proposed new venture would operate and to consider the investment. Details of the financing required from the trustees are given on a separate memorandam [sic].
>
> Sidney Stern described the Californian Legislation which controls loan companies and interest rates and explained why it would be more profitable for the lending which he envisaged to be made from funds obtained from a bank rather than deposits attracted from the public.
>
> The proposal is that the new company lend to small businessmen on the security *only* of real property. It appears that banks of California are reluctant to lend to the small businessman and a pilot project run for three months by his future partner has in his mind proved the worth of this project.
>
> Mr. Stern has secured a line of credit from a Californian bank but does not anticipate drawing down all of the line for some time, for new loans can

---

[27]On Aug. 3, 1972, Steinberg arranged for the incorporation of Lori Enterprises, Inc., a Delaware corporation. Steinberg retained the company's stock certificates, stock register, minute book, and corporate seal. The stock certificates and the stock register were eventually forwarded to Wobaco Trust in January 1973. Between 1971 and 1973, it was not uncommon for Wobaco Trust to utilize holding companies in acquiring trust investments.

[28]The 1972 calendar year tax return (Form 1120) filed by Lori Enterprises indicates that Wobaco Trust owned all of its outstanding stock.

be made from repayments as cash flow increases. He is in no hurry to start the operation but does want his financial arrangements completed.

Both Michael Nash and myself were impressed with his expertise and research which he has carried out. He has a proven record in the field of personal finance and is confident that his new project will be equally successful.

Phoenix Financial began operations in 1973, specializing in providing individuals and businesses with second mortgage loans. During 1973, petitioner received compensation of $6,076 as president of the company.[29] Petitioner was also president of Lori Enterprises at this time. Sometime prior to November 13, 1973, Phoenix Financial was sold.

On or about October 30, 1972, Steinberg indicated to Wobaco Trust that he would like to see the $285,000 Wobaco loan replaced with a loan from California Canadian Bank (Calcan) for an equal amount.[30] Calcan was willing to lend the Hylton Trust $285,000 at 6½-percent interest.[31] After further negotiations with Calcan, Steinberg forwarded copies of loan documents to Nash for Wobaco Trust to execute. Included among these documents were a $285,000 commercial loan note at 7-percent interest and a security agreement pledging the Teledyne stock held by Bank of America for Wobaco Trust's account. Steinberg also mailed to Wobaco Trust for execution a continuing guaranty agreement under which Wobaco Trust would guarantee a $250,000 line of credit to be provided to Phoenix Financial by Calcan.

On March 6, 1973, Nash sent a Telex to Steinberg regarding the proposed Hylton Trust borrowings from Calcan. In his Telex, Nash requested the following:

1. I WOULD LIKE YOU TO REPRESENT THE TRUSTEE IN THIS MATTER ON PROPER FEE BASIS AS OUR INTEREST REQUIRES TO BE PROTECTED (A) IN RESPECT TO THE BORROWINGS [sic] AND (B) IN ARRANGING FOR SUITABLE INDEMNITY BY PHOENIX TO THE TRUSTEE REGARDING PAYMENT BY PHOENIX OF LOAN OBLIGATION GUARANTEED BY TRUSTEE BUT IF YOU CONSIDER YOU

---

[29]Phoenix Financial's 1973 Federal tax return (Form 1120) reports total assets of $32,074. Of this amount, $21,717 represented "Loans to Officer."

[30]At this time, Steinberg represented petitioners and, presumably, his request was on petitioners' behalf.

[31]Although the Wobaco loan provided for a ½-percent prepayment penalty, Wobaco waived its right to the penalty.

WOULD BE IN A CONFLICT OF INTEREST POSITION CAN YOU RECOMMEND NAME AND ADDRESS OF ATTORNEY WHO COULD ACT FOR US PREFERABLY IN YOUR OFFICES.

\* \* \* \* \* \* \*

6. FOR THE SAKE OF OUR RECORDS I WOULD APPRECIATE CONFIRMATION FROM YOU REGARDING THE INCORPORATION OF PHOENIX FINANCIAL CORPORATION AND (IF APPLICABLE) THAT IT IS DULY LICENCED TO UNDERTAKE THE INTENDED LOAN ACTIVITIES AND THE NAMES OF THE OFFICERS AND DIRECTORS AND ABOVE ALL CONFIRMATION THAT THE EXPERIENCED PRINCIPAL WILL BE GUIDING THE PHOENIX MANAGEMENT IN ITS BUSINESS POLICY. YOU WILL [sic] KNOW THAT AT THE PRESENT TIME WE HAVE NONE OF THE INFORMATION REGARDING PHOENIX WHICH YOU WOULD REQUIRE IF YOU WERE IN MY POSITION CONSIDERING A PROPOSED TRUST INVESTMENT IN THIS COMPANY.

Steinberg agreed to represent the trust on this matter.

On March 9, 1973, Nash mailed to Steinberg executed copies of the promissory note, the security agreement, and the continuing guaranty agreement. As of April 14, 1973, the Hylton Trust contained sufficient funds to repay the Wobaco loan without the need to borrow from Calcan.[32] In a letter to Steinberg dated April 14, Nash questioned whether the trust should borrow to repay the Wobaco loan when it currently had the funds available. Nash indicated, however, he would appreciate Steinberg's views on the subject.[33] On April 27, 1973, Wobaco Trust, as trustee of the Hylton Trust, received loan proceeds of $285,000 from Calcan. On May 11, 1973, the Hylton Trust repaid the $285,000 loan from Wobaco.

In February 1973, Wobaco Trust contemplated hiring an investment advisor for the Florcken and Hylton Trusts. Wobaco Trust was sensitive to petitioners' views on this

---

[32]The source of these funds was the sale of the Teledyne stock held by the trust. See p. 632 *infra.*

[33]The text of Nash's letter on this matter states:

"I know you had it in mind to repay this out of the proposed new [Calcan] borrowing but in view of the fact that the trust is now liquid following the sale of the Teledyne shares, would it not be better for the trust to repay the borrowing, together with the interest, now, rather than out of any future borrowing from [Calcan].

"Please let me hear from you as soon as possible regarding your thoughts as to whether the US$285,000.00 plus interest owing by the Hylton Trust to World Banking & Trust Corporation (Cayman) Limited, should be repaid out of the monies now in New York or await payment pending conclusion of a new borrowing from [Calcan]."

subject and it sought to select a firm which would be agreeable to them.

Steinberg approached Stephen Weiss, managing partner of Weiss, Peck & Greer (WP & G),[34] regarding the prospect of handling the two trusts and petitioners' personal investments. At Steinberg's suggestion, Weiss prepared an investment proposal for Wobaco Trust to consider in its selection of an adviser. Weiss submitted this proposal in a letter mailed to Nash on February 27, 1973.

On February 26, 1973, WP & G mailed to Steinberg a two-page document dated February 26, and labeled "The Investment Advisory Agreement between Weiss, Peck & Greer and World Banking & Trust Corp. (Cayman) Ltd. Trust #1." The accompanying cover letter instructed Steinberg to obtain the signatures necessary to properly execute the investment advisory agreement on behalf of Wobaco Trust.

Prior to March 4, 1973, Weiss traveled to San Francisco to meet with petitioners and Steinberg. At this meeting, petitioners questioned Weiss extensively as to his firm's qualifications to manage the funds held by the two trusts and their personal funds.[35] On March 5, 1973, petitioners met with Weiss in New York to continue these discussions. A third meeting between petitioners and Weiss took place in San Francisco on March 14. Following this last meeting, Weiss wrote to petitioner indicating his delight "that we are going forward. I sincerely look forward to a mutually profitable relationship."

In a letter dated March 15, 1973, addressed to Nash, petitioner wrote the following:

> We would like to let you know that Vera and myself approve of your selection of Weiss, Peck and Greer to act as investment managers of the trust funds under your control.

On March 26, 1973, Steinberg and Weiss traveled to the Cayman Islands where, for the first time, Weiss met Nash and others involved with Wobaco Trust. At this time Nash signed

---

[34]WP & G is a New York based investment counseling firm. Between 1971 and 1973, WP & G managed several other Wobaco accounts. Weiss, however, handled none of these accounts personally.

[35]Prior to this meeting, Steinberg had fully apprised Weiss of the existence of the two trusts. Steinberg also informed Weiss that petitioners had personal funds to invest.

the investment advisory agreement dated February 26, 1973. A separate investment advisory agreement for the Florcken Trust was mailed by Weiss to Nash on April 2, 1973. Nash signed this agreement on April 14, 1973.

On April 7, 1973, petitioner wrote to Nash the following note:

I am happy to read that you concur in the selection of Weiss, Peck and Greer. We, holding with normal fate, hope that these people will do a superior job. All we can do is wait & see. I hope 1973 will be a good year for all of us.

Shortly after being engaged as investment counselor, WP & G recommended to Wobaco Trust that all the Teledyne stock held by the two trusts be sold. Wobaco Trust solicited a second opinion due to the substantial size of the Teledyne investment.

In conjunction with the proposed sale, WP & G obtained an opinion letter from its attorney regarding the securities law ramifications of such a sale. The attorney's opinion letter dated April 10, 1973, contains the following paragraph:

You have been asked by World Banking & Trust Corporation (Cayman) Limited ("WBTC"), a client of your firm, to act as its broker in connection with the sale of 293,728 shares (the "Shares") of the common stock of Teledyne Corporation, which it holds as trustee for persons who you are informed are relatives of Mr. Sidney Stern. Mr. Stern acquired the shares directly from the issuer as the result of the acquisition by Teledyne, sometime during 1968, of the shares of a corporation of which Mr. Stern was then an "affiliate", as defined in Rule 133 issued by the Securities and Exchange Commission (the "Commission") pursuant to the Securities Act of 1933 (the "33 Act"). The shares were transferred by Mr. Stern to WBTC sometime last year. *You have been assured by Mr. Stern and WBTC that neither he nor WBTC has sold or attempted to sell any of the shares received by him from Teledyne in connection with this acquisition,* and you have been assured by both Mr. Stern and Teledyne that he is not at present a controlling person of Teledyne. [Emphasis added.]

On April 16, 1973, Wobaco Trust resold to Teledyne, Inc., all 293,728 shares of common stock then held by the Hylton and Florcken Trusts. The trusts received total net proceeds of $4,354,132.71 from the sale, of which $2,264,659.53 was allocated to the Hylton Trust and $2,089,473.18 to the Florcken Trust.

During WP & G's tenure as investment counselor, petitioner carefully monitored the trusts' activities. Petitioner frequently **wrote** to Weiss offering unsolicited words of advice and

encouragement regarding the management of both his personal account and those of the trusts.[36] In these letters, petitioner occasionally expressed his concern for preserving the trust corpus while producing sufficient income to service the annuities.[37] Despite petitioner's watchful eye, WP & G made all the investment decisions for the accounts.

In a letter dated August 14, 1973, petitioner wrote to Weiss that—

Elliot Steinberg has informed * * * [Stephen] Weiss today regarding the closing of our accounts, with WP & G, immediately. Please send all the securities, funds and any other documents to our home as soon as possible.

The accounts closed are now in the following names: (1) Sidney Stern and Vera Stern (2) Vera Stern (3) Sidney Stern. Your prompt and kind personal handling shall be appreciated.

On August 15, 1973, Wobaco Trust notified WP & G that its investment advisory services on behalf of the Hylton and Florcken Trusts were being terminated. On that same day, Wobaco Trust wrote the following letter to Steinberg:

Thank you for your telephone call of August 14 relative to Hylton and Florcken.

We have written to Mr. Weiss as suggested and enclose a copy of our letter. Weiss, Peck & Greer accounts from June 30 to the date that the Agreement was cancelled has to be paid and they will be paid when we know how much is due.

Funds held for these clients will be invested in 30 day deposits until further notice.

Also enclosed is a copy of a letter to Bank of America, New York, which was sent to follow-up our telex instructions.

If there is anything further we can do please let me know.

On or about October 1, 1973, Wobaco Trust retained the services of Wharfside Investment Co., a San Francisco based investment counseling firm. Wobaco Trust had engaged Wharfside to handle other accounts prior to this time.

---

[36]A number of these letters reflected petitioner's concern that WP & G was permitting funds to remain inactive when they could have been placed in short-term securities.

[37]WP & G invested the trusts' funds in fixed-income securities (e.g., Eurodollar notes) and common stocks. As of July 31, 1973, common stocks comprised approximately 22 percent of the trusts' assets. For the most part, the value of these stocks declined slightly between April and August 1973.

Between 1971 and 1973, petitioner carefully reviewed the administration of the Hylton and Florcken Trusts.[38] On a number of occasions, petitioner offered comments and suggestions to Wobaco Trust relating to investment policies and reporting techniques. Petitioner also expressed great concern for the fees charged by Wobaco Trust. In fact, in June 1973, Wobaco Trust retroactively reduced the fees applicable to the two trusts. Eventually, petitioner's displeasure with the trust reporting, documentation, and fees culminated in his removing Wobaco Trust as trustee in 1973 and substituting Canadian Imperial Bank of Commerce Trust Co. (Cayman), Ltd., as trustee.

During the years in issue (1971–73), neither the Hylton Trust nor the Florcken Trust distributed any income or corpus to the trusts' beneficiaries in their capacities as such. Pursuant to the October 14, 1971, annuity agreement, the Hylton Trust paid the annuities due to petitioners on October 14, 1972, and October 14, 1973. No annuity payments were made from the Florcken Trust between 1971 and 1973.

In an addendum to their 1971 joint income tax return, petitioners made the following statement:

On October 14, 1971 the taxpayers exchanged the following shares of stock and cash for the right of each to receive a sum annually for the full term of each of their respective lives:

*Annual sum*
Sidney B. Stern............................ $222,757.01
Vera F. Stern ................................. 27,216.85

| *Shares and corporation* | | *Sale price* |
|---|---|---|
| Sidney B. Stern......126,867 shares of Teledyne, Inc ......... | | $2,569,056.70 |
| Vera F. Stern ......... 17,136 shares of Teledyne, Inc ............. | | 347,004.00 |

Computation of each annual payment was based upon the fair market value of each share of stock of the above corporation on October 14, 1971, the date of the exchange, and the aggregate fair market value of the above shares and cash on that date was equal to the value of Sidney B. Stern, age 49, receiving the annual sum of $222,751.01[39] for his lifetime and Vera F. Stern, age 49,

---

[38]On one occasion, petitioner discovered a $5,000 or $6,000 reporting error in the trustee's records.

[39]This amount should be $222,757.01.

receiving the annual sum of $27,216.85 for her lifetime, all as determined by Table A (1) of Federal Estate Tax Regulations Section 20.2031–10(e).[40] Pursuant to the provisions of Revenue Ruling 69–74 no gain or loss was recognized on October 14, 1971 and the tax consequences of the receipt of the annual sum by each taxpayer will not commence until the date of the first payment, October 14, 1972.

Petitioners did not disclose the 1972 annuity transaction with the Florcken Trust.

On their 1972 joint income tax return, petitioners reported the annuity payments from the Hylton Trust as follows:

|  | Petitioner | Vera |
| --- | --- | --- |
| Portion treated as long-term capital gain.......... | $89,212.92 | $10,453.52 |
| Portion treated as ordinary interest income ...... | 124,856.57 | 15,729.09 |
| Portion treated as nontaxable return of basis.... | 8,687.52 | 1,034.24 |
| Totals................................................... | 222,757.01 | 27,216.85 |

These calculations are based on Rev. Rul. 69–74, 1969–1 C.B. 43. Petitioners reported their 1973 annuity payment from the Hylton Trust in the same manner.

In his statutory notice, respondent determined that:

the annuity realized from the sale of Teledyne shares has an ascertainable fair market value in the year of sale. The entire amount of gain determined under section 1001 is recognized in the year of sale December 31, 1971.

In the alternative, it is determined that as grantor of the Bahama Trust (Wobaco Trust Limited—trustee), you are taxable on the net income from it for the taxable years 1972 and 1973 because you furnished the consideration for the creation of the trusts; the named settlor was settlor in form only; the amounts distributable are deemed to be amounts distributable without the consent or approval of an adverse party under section 677(a)(1), and that the purported annuity agreement is solely a prearranged distribution of income agreement. Your taxable income for 1972 and 1973 has accordingly been increased to include the income of the trust as owner of the trust under section 671 of the Code.

Subsequent to the filing of his initial answer, respondent discovered the existence of the Florcken Trust and its associated annuity agreement. See *Stern v. Commissioner*, 74 T.C. 1075 (1980). Respondent thereafter filed an amended answer asserting additional deficiencies in petitioners' 1972 and 1973 income taxes based on this new information. The additional deficiencies are based on applying to the Florcken Trust the

---

[40]The reference here should be to sec. 20.2031–10(*f*), Estate Tax Regs.

same alternative theories set forth above, i.e., the stock transfer constituted a closed transaction or a transfer in trust.[41]

## OPINION

Petitioners transferred Teledyne stock to two foreign situs trusts. The question presented is the income tax characterization of the transfers. Petitioners contend that the transfers of appreciated securities to the Hylton and Florcken Trusts in exchange for annuities should be taxed in accordance with the guidelines set forth in section 72,[42] as interpreted by Rev. Rul.

---

[41]In his amended answer, respondent provided an elaboration on his trust theory:

"(e) The true settlor of CT 1136 [Florcken Trust] was Sidney Stern and his transfer of 136,850 shares of Teledyne, Inc. stock to that trust * * * was not a sale but a transfer to the corpus of that trust.

"(f) The amounts which were to be paid to Sidney Stern under the "agreement of sale" between himself and the trustee of the Florcken Trust were not true annuities, but distributions of the income earned by the Florcken Trust.

"(g) By virtue of the de facto control exercised by petitioners or one of them over the investment policy and administration of the Florcken Trust, and further as a result of powers reserved by petitioners in the deed of settlement of the Florcken Trust, petitioners are to be treated as the grantors of the Florcken Trust and the net income of that trust is taxable to petitioners pursuant ot section 671 through 677 of the internal [sic] Revenue Code of 1954."

[42]SEC. 72. ANNUITIES: CERTAIN PROCEEDS OF ENDOWMENT AND LIFE INSURANCE CONTRACTS.

(a) GENERAL RULE FOR ANNUITIES.—Except as otherwise provided in this chapter, gross income includes any amount received as an annuity (whether for a period certain or during one or more lives) under an annuity, endowment, or life insurance contract.

(b) EXCLUSION RATIO.—Gross income does not include that part of any amount received as an annuity under an annuity, endowment, or life insurance contract which bears the same ratio to such amount as the investment in the contract (as of the annuity starting date) bears to the expected return under the contract (as of such date). This subsection shall not apply to any amount to which subsection (d)(1) (relating to certain employee annuities) applies.

(c) DEFINITION.—

(1) INVESTMENT IN THE CONTRACT.—For purposes of subsection (b), the investment in the contract as of the annuity starting date is—

(A) the aggregate amount of premiums or other consideration paid for the contract * * *

* * * * * * *

(3) EXPECTED RETURN.—For purposes of subsection (b), the expected return under the contract shall be determined as follows:

(A) LIFE EXPECTANCY.—If the expected return under the contract, for the period on and after the annuity starting date, depends in whole or in part on the life expectancy of one or more individuals, the expected return shall be computed with reference to actuarial tables prescribed by the Secretary or his delegate.

(B) INSTALLMENT PAYMENTS.—If subparagraph (A) does not apply, the expected return is the aggregate of the amounts receivable under the contract as an annuity.

69–74, 1969–1 C.B. 43. Accordingly, petitioners argue that they recognized no immediate gain upon the sale of the securities to the trusts. Instead, petitioners claim that each annuity payment received constitutes a partial return of their basis in the transferred securities, a partial recognition of the capital gains attributable to the transferred securities, and ordinary annuity income. Petitioners reported the 1972 and 1973 payments received from the Hylton Trust in this manner.[43]

Respondent, on the other hand, views the creation of the trusts and the transfer of the securities as integral parts of the same transactions. Respondent contends that the consequence of this integration is (1) to treat the purported sales of the securities as transfers in trust subject to retained annual payments, (2) to characterize petitioners as the true settlors of the trusts, and (3) to tax petitioners on the trusts' income pursuant to the grantor trust provisions of the Internal Revenue Code (secs. 671 to 679) irrespective of the trusts' distributions or payments to petitioners.

In the alternative, respondent contends that if petitioners' stock transfers are valid sales in exchange for annuities, then the transactions should be considered "closed" and the resulting gain must be recognized in the year of sale. Respondent cites *212 Corp. v. Commissioner*, 70 T.C. 788 (1978), and *Estate of Bell v. Commissioner*, 60 T.C. 469 (1973), in support of his alternative argument.[44]

---

[43]Petitioners received no payments from the Florcken Trust during the years in issue.

[44]At the outset, we must dispose of two evidentiary questions raised by the parties. The first relates to the admissibility of Alan Hammerman's 1971, 1972, and 1973 business diaries. During the years in issue, Hammerman was a member of Elliot Steinberg's law firm. It was Hammerman who contacted Peter Hylton and asked him if he were willing to aid petitioners in preparing a foreign situs trust. At trial, respondent introduced Hammerman's diaries into evidence for the purpose of pinpointing when Hylton signed the deed of settlement creating the Hylton Trust. Respondent relies on the entry of the word "Cayman" on Apr. 5 and 6, 1972, and the notation "Fla.-S.F." on Apr. 10 through 13, 1972, to support his contention that Hylton did not sign the trust document until April 1972.

At trial, we refused to admit the diaries because respondent failed to lay a proper foundation for their admissibility. On brief, respondent requests us to reconsider our ruling on the basis that the diaries (1) constitute an admission by a party-opponent (rule 801(d)(2), Fed. R. Evid.) in that Hammerman was petitioners' agent, or (2) qualify as business records (rule 803(6), Fed. R. Evid.). We decline to do so.

We cannot say that any of the entries in the diaries relate to petitioners. Petitioners' names do not appear anywhere in the diaries. Although Hylton's name does appear therein, there is no indication that the references to Hylton pertain to petitioners' affairs. Testimony at trial revealed that Hylton and Hammerman worked on some 20 projects together during

The pivotal question is whether the transactions at issue are to be treated as annuities or transfers in trust. This inquiry is

---

the years in issue. Simply stated, we cannot link any of the entries in the diaries to petitioners' transactions without the benefit of further explanation and development by the author of the diaries or someone with knowledge of their preparation. Rule 901(a), Fed. R. Evid. Consequently, respondent has failed to demonstrate that the entries relate to any matter within the scope of Hammerman's representation on petitioners' transactions. Rule 801(d)(2)(D), Fed. R. Evid. Moreover, respondent's proposed use of the diaries depends on their reliability. Rule 803(6), Fed. R. Evid. Respondent, however, did not call any witness to establish that the diaries were records of a regularly conducted business activity and that Hammerman kept a consistent log of his appointments and travel. See, e.g., *Gibbs v. State Farm Mutual Insurance Co.*, 544 F.2d 423, 428 (9th Cir. 1976). In fact, the sporadic entries reflected in the diaries appear to indicate that such was not the case.

The second evidentiary question relates to the use of certain documents by respondent. During trial, respondent introduced into evidence certain correspondence files maintained by Wobaco Trust, Weiss, Peck & Greer, and Elliot Steinberg's law firm, all relating to Hylton and Florcken Trust transactions. These correspondence files contained several unsigned copies of letters and memoranda bearing the name of Wobaco Trust officers and others involved in the transactions. The Wobaco Trust files were obtained by respondent through petitioners' counsel during the pretrial discovery stage (see *Stern v. Commissioner*, 74 T.C. 1075 (1980), and were introduced at trial as joint exhibits. When respondent moved at trial to have the above documents admitted, petitioners' counsel voiced no objection. Consequently, this Court received the documents into evidence.

In his proposed findings of fact, respondent relied on the content of these unsigned letters to support his position. Only in his reply brief did petitioners' counsel object to respondent's use of this correspondence. The basis of this objection is the absence of any evidence in the record that the correspondence was actually mailed by the purported author or that it was received by the addressee. For the reasons stated below, we reject petitioners' objections.

Rule 103(a)(1), Fed. R. Evid. sets forth the following standard for timely objections:

(a) *Effect of erroneous ruling.* Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

(1) *Objection.* In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context; * * *

The reason for this rule is to avoid surprising opposing counsel and the trial judge. As stated in the Advisory Committee's Note accompanying Rule 103(a):

"Rulings on evidence cannot be assigned as error unless (1) a substantial right is affected, and (2) the nature of the error was called to the attention of the judge, so as to alert him to the proper course of action and enable opposing counsel to take proper corrective measures. [Advisory Committee's Note, 56 F.R.D. 183, 195 (1973).]"

Petitioners' failure to timely object to the introduction of the correspondence files constitutes a waiver of their objection. *United States v. Jamerson*, 549 F.2d 1263, 1266–1267 (9th Cir. 1977) ("It's a fundamental rule of evidence that an objection not timely made is waived."). To hold otherwise at this late stage of the proceeding would be grossly unfair to respondent who could have argued the merits of the documents' admissibility and/or could have taken alternative measures to obtain the same information prior to the closing of the record. The tardiness of petitioners' objections is especially acute in this case since most of the documents objected to, i.e., the trustee's files and Steinberg's files, were obtained by respondent from petitioners' counsel. Petitioners' counsel had ample opportunity to review these documents before trial and had ample opportunity to inquire of the trustee as to the veracity of the documents. Furthermore, most of the documents objected to are correspon-

fundamentally a question of fact which must be decided in light of all the surrounding events.[45] In making this determination, we find ourselves once again confronted with the delicate balancing between a taxpayer's entitlement to arrange his affairs in whatever legal manner he chooses and the omnipresent requirement that a transaction's substance rather than its form shall govern its tax consequences unless the statute indicates that form is to govern. See, e.g., *Commissioner v. P. G. Lake, Inc.*, 356 U.S. 260, 266–267 (1958); *Lazarus v. Commissioner*, 58 T.C. 854, 864 (1972), affd. 513 F.2d 824 (9th Cir. 1975). Moreover, even if a taxpayer appears to be entitled to the benefit of a particular statutory provision, he may nevertheless find himself caught within the net of another statutory provision. *Gregory v. Helvering*, 293 U.S. 465 (1935).

In reviewing and weighing the facts of this case, we note that the principle of substance over form is "peculiarly applicable to annuities and trusts because they are easily susceptible of manipulation so as to create illusion." *Lazarus v. Commissioner*, 58 T.C. at 864. See also *LaFargue v. Commissioner*, 73 T.C. 40, 53 (1979), on appeal (9th Cir., July 22, 1980); *Bixby v. Commissioner*, 58 T.C. 757, 789 (1972). As stated in *Lazarus v. Commissioner*, 58 T.C. at 864 (citing *Helvering v. Clifford*, 309 U.S. 331, 334 (1940)):

"Technical considerations, niceties of the law of trusts or conveyances, or the legal paraphernalia which inventive genius may construct" must not frustrate an examination of the facts in the light of the economic realities."

In fact, this Court has on numerous occasions viewed a series of related transactions as a whole and found that what was in form a transfer of property to a trust in exchange for an annuity was, in substance, a trust of which the "annuitant" was a grantor-owner or beneficiary. See, e.g., *LaFargue v. Commissioner, supra; Lazarus v. Commissioner, supra; Bixby v.*

---

dence involving the same law firm representing petitioners in this case. Although it is not incumbent upon petitioners to make out respondent's case, we find it somewhat peculiar that petitioners' counsel is contesting the mailing and receipt of documents to which his firm was a party.

[45]Respondent did not assert the deficiencies relating to the transactions involving the Florcken Trust until his amended answer. Consequently, respondent bears the burden of proof on those issues. Rule 142(a), Tax Court Rules of Practice and Procedure. Petitioners, however, bear the burden of proof on these same issues in relation to the Hylton Trust. Rule 142(a), Tax Court Rules of Practice and Procedure.

*Commissioner, supra; Archbishop Samuel Trust v. Commissioner*, 36 T.C. 641 (1961), affd. sub nom. *Samuel v. Commissioner*, 306 F.2d 682 (1st Cir. 1962).

These last mentioned cases have enumerated several factors which should be considered in inquiries such as the one presently before us. These factors include: (1) The relationship between the creation of the trust and the transfer of property to it, *LaFargue v. Commissioner*, 73 T.C. at 53–54, and *Lazarus v. Commissioner*, 58 T.C. at 866; (2) the relationship between the income generated by the transferred property and the amount of the annuity payments, 58 T.C. at 867–868; (3) the degree of control over the transferred properties exercisable by the annuitant, *Samuel v. Commissioner*, 306 F.2d at 687, and *Bixby v. Commissioner*, 58 T.C. at 789–790; (4) the nature and extent of the annuitant's continuing interest in the transferred properties, *LaFargue v. Commissioner*, 73 T.C. at 54, 56–57, and *Samuel v. Commissioner*, 306 F.2d at 687; (5) the source of the annuity payment, *LaFargue v. Commissioner*, 73 T.C. at 54, and *Lazarus v. Commissioner*, 58 T.C. at 868; and (6) the arm's length nature of the annuity/sale arrangement, 58 T.C. at 868–869.

For the reasons stated below, we find that the transactions in issue constituted transfers in trust by petitioners whereby they retained the rights to annual payments. In doing so, we reject petitioner's contention that the transfers were sales in exchange for annuities. We emphasize that in reaching our conclusion no one factor was decisive.

First, we harbor no doubts that the creation of the Hylton and Florcken Trusts and the subsequent "annuity/sale" agreements were integral parts of a prearranged plan. The trusts and the annuity agreements were central to the financial plan devised for petitioners by Elliot Steinberg, their personal attorney. Neither trust nor its accompanying annuity agreement would have been executed alone; each was dependent upon the other.[46] The nominal corpora of the two trusts in relation to the value of the securities transferred by petition-

---

[46]Although the record contains an Oct. 11, 1971, memorandum prepared by Wobaco Trust wherein it states that the trustee decided to enter the annuity agreement with petitioners only after it had analyzed the agreement's potential effect on the trust, the agreement's potential benefits to the beneficiaries and its own power to execute such an agreement, we do not believe such an independent analysis was ever made by the trustee. Rather, the

ers soon after the trusts' creation amply support this conclusion. Also supportive of this finding is the time proximity between the creation of the two trusts and the subsequent annuity agreements with those trusts. (The Hylton Trust was created in September 1971, and the annuity agreement was executed in October 1971; the Florcken Trust was created in May 1972, and the original annuity agreement was executed in June 1972.) The subsequent transfers, which petitioners characterize as sales in exchange for annuities, put the flesh on the trusts' skeletal frames. Without these transfers, the trusts would have been empty shells. See *Samuel v. Commissioner*, 306 F.2d at 689; *LaFargue v. Commissioner*, 73 T.C. at 54.[47] In essence, the consideration exchanged for the "annuities" constituted the corpora of the newly created trusts.

Second, petitioners could have achieved the same economic result by transferring the properties to the trusts and reserving the right to receive annual payments equal to the calculated annuity amounts rather than "selling" the properties to the trusts.[48] See *Lazarus v. Commissioner*, 58 T.C. at 867–868. Under either approach, the amount, if any, remaining in the trusts after fulfilling the annuity obligations would inure to the natural objects of petitioners' bounty, i.e., their children. 58 T.C. at 867–868.

Third, the only source of petitioners' "annuities" were the properties transferred to the trusts and the income derived therefrom. See *Lazarus v. Commissioner*, 513 F.2d at 830; *LaFargue v. Commissioner*, 73 T.C. at 54. The nominal amounts contributed to the trusts as initial corpora may be disregarded. 73 T.C. at 54. *Bixby v. Commissioner*, 58 T.C. at 791. The trusts in this case are not mere conduits for the income to be derived from the transferred properties, compare *Lazarus v. Commissioner*, 58 T.C. at 869,[49] but that characteris-

evidence indicates that the creation of the trust was intended to facilitate petitioners' financial planning, which from the start included the "annuity/sale" agreement. Therefore, there was never any question but that the trust would "purchase" petitioners' securities.

[47]The mere fact that petitioners were not named settlors of the two trusts does not dissuade us from treating the subsequent stock transfers as part and parcel of the trust arrangement. As discussed, *infra*, we believe petitioners were the true settlors of the trusts.

[48]Similarly, petitioners could have protected themselves from any potential default in the payment of the annual amounts by making the trusts revocable upon default.

[49]Although a tie-in between the size of the annuity payments and the income from the transferred properties is not present in this case, the evidence does indicate that petitioners

tic is not essential. See *LaFargue v. Commissioner*, 73 T.C. at 54, 57. Here, the nexus between the payments and the transferred properties creates in the transferor a continuing interest in those properties. This is uncharacteristic of a sale and annuity arrangement wherein the annuitant generally assumes the role of a creditor. See *Samuel v. Commissioner*, 306 F.2d at 687;[50] *Lazarus v. Commissioner*, 513 F.2d at 830; *LaFargue v. Commissioner*, 73 T.C. at 54.

The source of the "annuity" payments, however, is not the only factor that demonstrates petitioners' continuing interest in the transferred properties. The trust provisions potentially restore to petitioners most of the incidences of ownership. For example, petitioners' status as beneficiaries of the trusts ensures that they will participate in any appreciation of the trust assets.

The nature and significance of petitioners' continuing interest is also discernible from other trust provisions which permit the trustee to guarantee petitioners' loans, to lend them money on an unsecured, interest-free basis, to pay premiums on insurance policies covering their lives, and to distribute corpus or income to them. Cf. *Bixby v. Commissioner*, 58 T.C. at 789. Furthermore, both trust instruments vest petitioners with inter vivos limited powers of appointment whereby they could dispose of all, or any part, of the corpus of

---

intended to service the annuities from the trusts' income. The correspondence from petitioner to Stephen Weiss, managing partner of Weiss, Peck & Greer, reflects this intent. Several letters express petitioner's concern that the trusts' corpora should be preserved while producing sufficient income to service the annuities. Also reflective of petitioners' intent is the nature of the trusts' investments. From the outset, it was the trustee's and petitioner's game plan to hold a significant portion of the trusts' assets in common stocks rather than holding the entire amount in safe, fixed income securities with sufficient yields to service the annuities. Furthermore, the trustee invested in Phoenix Financial Corp. and considered other investments that may be characterized as "unconventional."

[50]Like petitioners, herein, the taxpayer in *Samuel v. Commissioner*, 306 F.2d 682 (1st Cir. 1962), affg. *Archbishop Samuel Trust v. Commissioner*, 36 T.C. 641 (1961), argued that he had sold property, the Dead Sea Scrolls, to a trust in exchange for an annuity. In rejecting the taxpayer's argument, the court pointed out that the only source of the annuity was property transferred to the trust and its income. Elaborating on this point, it stated:

"While, as petitioner contends, it may be legally permissible for a settlor to be the creditor of a trust, here there was, in effect, but a single transaction. In short, the transfer, which petitioner contends established him as a creditor of the trust, was the very foundation of the trust itself. The transfer which the petitioner views as a sale to the trust was, in reality, the same transfer which created the trust. [306 F.2d at 688.]"

either trust.[51] While we recognize that petitioners' access to many of these provisions requires the acquiescence of Wobaco Trust, the evidence in this case demonstrates the trustee's predisposition to satisfy petitioners' (or Steinberg's) requests. For example, petitioners' influence is reflected in the hiring and firing of Weiss, Peck & Greer (WP & G), in the trusts' investment policies, in the refinancing of the $285,000 Wobaco loan, and in the relocation of the Hylton Trust to the Cayman Islands. Furthermore, we do not believe it is coincidental that the Hylton Trust financed petitioners' new venture, Phoenix Financial Corp. by providing all of its initial capital and guaranteeing its line of credit. Moreover, even if the trustee were not predisposed to petitioners' views, petitioners reserved the right to "pull the carpet" from under the trustee by exercising their inter vivos limited powers of appointment. In making these statements, we do not mean to impugn Wobaco Trust's status as an independent trustee. By the same token, the nature of the inquiry before us requires a practical and realistic approach. See *Bixby v. Commissioner*, 58 T.C. at 789. Pursuant to this directive, we also cannot ignore petitioners' power to remove Wobaco Trust as trustee without cause. Cf. *Corning v. Commissioner*, 24 T.C. 907, 914 (1955), affd. per curiam 239 F.2d 646 (6th Cir. 1956). In fact, petitioners exercised this power in 1973 when they replaced Wobaco Trust as trustee.[52]

Fourth, petitioner's actions with respect to the trusts suggest that petitioner viewed himself more as the beneficial owner of the transferred properties than as the creditor of the trustee. See *Samuel v. Commissioner*, 306 F.2d at 688; *LaFargue v. Commissioner*, 73 T.C. at 56.[53] Petitioner participated extensively in the trusts' investment policies. From the outset, it was envisioned that one-half of the investments would "be dealt with upon the advice" of petitioner. See p. 621 *supra*.

---

[51] Petitioner possessed the limited power of appointment over the Hylton Trust. Similarly, Vera possessed the power of appointment with respect to the Florcken Trust. There appears to be no prohibition in the trust documents against petitioners, exercising his power in favor of Vera and vice versa.

[52] The foregoing observations regarding the interrelationship between petitioners and Wobaco Trust are made solely in the context of the substance-over-form issue before us. See also note 53 *infra*.

[53] It is arguable that petitioner's actions may be attributable to his position as beneficiary of the Hylton Trust. His activities, however, were not limited to the Hylton Trust, but rather applied equally to the Florcken Trust, of which he was not a beneficiary.

Although these original plans were never implemented, petitioner did propose several investments in loan companies. He also acted in an advisory role regarding the financing of at least one of these proposed acquisitions. See p. 626 *supra*. In each of these proposals, petitioner intended to operate the companies. Eventually, the Hylton Trust financed petitioner's reentry into the loan business by investing $25,000 in, and guaranteeing a line of credit to, Phoenix Financial Corp.

The events surrounding the retention and eventual release of the trusts' investment counselor, Weiss, Peck & Greer, also indicates that petitioner viewed himself as the beneficial owner of the properties. Petitioner personally interviewed Stephen Weiss, the managing partner of WP & G in order to ascertain the firm's ability to manage his personal funds and those of the trusts. Although it is uncertain who actually hired WP & G to manage the trusts' funds, it is clear that WP & G would not have been retained without petitioner's approval. With respect to the termination of WP & G's services, however, the August 15 letter indicates that petitioner and Steinberg called the shots. In any event, we do not believe it is mere coincidence that the hiring of WP & G to manage petitioners' personal assets and WP & G's eventual dismissal exactly matched Wobaco Trust's hiring and firing of WP & G.

Furthermore, petitioner's active role in the affairs of the trusts was not limited to their investment policies. For instance, the location of the Hylton Trust was moved to the Cayman Islands to satisfy petitioner's demand; petitioner carefully monitored the administration of the trusts and, on occasion, offered comments and suggestions; and petitioner removed Wobaco Trust due to his displeasure with the trust's reporting, documentation, and fees.[54]

Fifth, petitioner claimed to be the owner of the trusts' properties when it was convenient to do so. In the personal financial statement accompanying his application for a personal property broker's license, petitioner listed the Teledyne stock as being among his assets.

---

[54]It should be noted that the foregoing observations are made solely in the context of the sale or exchange versus trust issue and not in the context of whether petitioner's role in the trusts' affairs subject him to tax under the grantor trust provisions (secs. 671 through 679).

Sixth, petitioners' contention that they "sold" their Teledyne stock to the trusts in exchange for annuities is inconsistent with the statements contained in the opinion letter obtained by WP & G in connection with the April 16, 1973, sale of the Teledyne stock. In pertinent part, the opinion letter states:

Mr. Stern acquired the shares directly from the issuer as the result of the acquisition by Teledyne, sometime during 1968, of the shares of a corporation of which Mr. Stern was then an "affiliate" * * * . The shares were transferred by Mr. Stern to WBTC [Wobaco Trust (Cayman)] sometime last year. You have been assured by Mr. Stern and WBTC *that neither he nor WBTC has sold or attempted to sell any of the shares received by him from Teledyne in connection with this acquisition* * * * [Emphasis added.]

In view of the foregoing, we hold that the transactions involved herein were not "sales" in exchange for annuities, but rather they were transfers in trust subject to retained annual payments. In so holding, we reject an alternative argument made by respondent on brief in which he claims that the annuity agreements were shams. According to respondent, the ease with which the June 29, 1972, annuity agreement with the Florcken Trust was rescinded, and the prolonged postponement of the annuity payments from the Florcken Trust, indicate that the Florcken annuity agreement was never intended to create a legally binding obligation. Respondent then claims, without any apparent justification, that the illusory nature of the Florcken annuity agreement must also apply to the Hylton agreement. There is nothing in the record to support respondent's claim. Although the circumstances surrounding the June 29, 1972, agreement are suspicious, this is not reason enough to conclude the transactions were shams.

Petitioners argue against the result reached herein by pointing to the arm's-length nature of the transactions. They claim that, unlike the taxpayers in *LaFargue v. Commissioner, supra*, and *Lazarus v. Commissioner, supra*, they have calculated the annual annuity payments using the fair market of the properties transferred (compare *Lazarus v. Commissioner, supra*) and imputing an interest factor (compare *LaFargue v. Commissioner, supra*). Furthermore, petitioners assert that the administration of the trusts by Wobaco Trust, an independent trustee, respected the arm's-length nature of the transactions. Compare *Bixby v. Commissioner, supra*. We agree with peti-

tioners that the facts in this case are not as egregious as those in the above-cited cases. Nevertheless, as stated previously, transactions involving annuities and trusts warrant close scrutiny, and must be analyzed in a realistic manner. Accordingly, the facts in *Lazarus, LaFargue,* or *Bixby* do not represent the limits of our inquiry. Rather, we have given due consideration to the similarities between (1) a transfer of property to a trust accompanied by the reservation of annual payments and (2) the "sale" of property to a trust in exchange for an annuity. In general, the degree of similarity and hence the outcome of each case will depend on the facts and circumstances presented. See *LaFargue v. Commissioner,* 73 T.C. at 58.

Much of petitioners' argument on brief focuses on the nature and source of the control, if any, they exercised or possessed over the trusts and their properties, and whether such control dictates treating the transactions as transfers in trust. In support of their position, petitioners cite cases involving section 2036 (transfers with retained life estate), section 674 (power to control beneficial enjoyment), and section 453 (installment method). While we agree that the "control" referred to in the cited cases[55] differs from the control exercised or enforceable by petitioners, this observation does not alter our result. Initially, we note that our result does not turn on the nature and extent of petitioners' control over the trusts and their properties. Rather, it is based on a realistic view of petitioners' overall relationship vis-a-vis the transferred properties. Furthermore, we do not find the cases involving sections 2036, 674, and 453 to be particularly relevant. The nature of the inquiry before us and its appurtenant tax consequences is distinguishable from those cases.[56] In the present context, we reiterate the observation made in *Bixby v. Commissioner,* 58 T.C. at 789–790:

Also, it should be noted that the *Samuel* test need not coincide with similar-sounding tests in other areas of the tax law where other considerations may

---

[55]These cases include *United States v. Byrum,* 408 U.S. 125 (1972); *Rushing v. Commissioner,* 441 F.2d 593 (5th Cir. 1971); *Pityo v. Commissioner,* 70 T.C. 225 (1978); *Estate of Goodwyn v. Commissioner,* T.C. Memo. 1976–238 (1976).

[56]For example, sec. 2036 is not applicable to "sales." Whether or not a "sale" occurred, however, is the very issue confronting us.

be at work, for example, the test carefully constructed by Congress in sections 671 through 678, the test appearing under the family partnership provisions * * * and the specific tests of section 2036 * * * [Citations omitted.]

See also *LaFargue v. Commissioner*, 73 T.C. at 57–58; *Lazarus v. Commissioner*, 58 T.C. at 872 (discussing *Becklenberg's Estate v. Commissioner*, 273 F.2d 297 (7th Cir. 1959)).

The next question presented is the identity of the settlors of the two trusts. Although the trust instruments state that Peter Hylton and Herbert Florcken are the settlors, they are settlors in name only. See *Bixby v. Commissioner*, 58 T.C. at 791. The true settlors of the two trusts are petitioners. This conclusion is based on the following factors: (1) The two named settlors supplied only nominal corpora ($6,000 in total) in comparison to the substantial amounts transferred by petitioners to the trusts (approximately $5 million), see *Bixby v. Commissioner, supra* (nominal settlor's $1,000 contribution to corpus disregarded); (2) the creation of the trusts and the transfers by petitioners occurred in close time proximity (see *Estate of Schwartz v. Commissioner*, 9 T.C. 229, 239 (1947)); (3) petitioners and Steinberg orchestrated the entire arrangement (see pp. 640–641 *supra*); (4) unusual circumstances surrounded the creation of the trusts, i.e., Hylton's attenuated connection to the Stern family; and (5) the named beneficiaries of the trusts reflect petitioners' desires as to the lifetime and testamentary disposition of their properties (see *Smith v. Commissioner*, 56 T.C. 263, 288–289 (1971)). Indeed, the main reason for the entire arrangement was to facilitate petitioners' estate planning.

We now turn to the question of the extent to which petitioners are taxable on the income of the trusts under the so-called grantor trust provisions of the Code (secs. 671 through 679). In pertinent part, section 677(a) provides, as follows:

(a) GENERAL RULE.—The grantor shall be treated as the owner of any portion of a trust, whether or not he is treated as such owner under section 674, whose income without the approval or consent of any adverse party[57] is, or, in the discretion of the grantor or a nonadverse party, or both, may be—

---

[57]Wobaco Trust's only interest in the two trusts is as trustee. Accordingly, it is not an adverse party under sec. 672(b). Sec. 1.672(a)–1(a), Income Tax Regs.

'(1) distributed to the grantor or the grantor's spouse;

(2) held or accumulated for future distribution to the grantor or the grantor's spouse * * *

Applying the above section to our facts, we find that the entire income of the trusts, including the gain on the April 16, 1973, sale of the Teledyne stock, is taxable to petitioners.

With respect to the Hylton Trust, petitioners are taxable on the trust's current income, both ordinary income and income allocable to corpus, to the extent that it does not exceed their reserved annual payments, i.e., the purported annuities. See *LaFargue v. Commissioner*, 73 T.C. at 58–60 (1979); *Archbishop Samuel Trust v. Commissioner*, 36 T.C. at 651–653.[58] Moreover, petitioners are taxable on any current income in excess of the reserved payments because both petitioners are beneficiaries of the Hylton Trust. The trust instrument provides the trustee with "absolute discretion" to pay the trust income to all or any one of the named beneficiaries. Accordingly, the current income in excess of the reserved payments "may be distributed" to petitioners within the meaning of section 677(a)(1).

The question remains, however, whether petitioners are taxable on the April 16, 1973, sale of the Teledyne stock and, if so, to what extent. We find that the entire sale proceeds were being "held or accumulated for future distribution" to petitioners. Consequently, petitioners are taxable on the entire gain. Sec. 677(a)(2).[59]

Essentially the same issue confronted this Court in *Archbishop Samuel Trust v. Commissioner*, 36 T.C. 641 (1961), affd. sub nom. *Samuel v. Commissioner*, 306 F.2d 682 (1st Cir. 1962). In *Archbishop Samuel Trust*, as in this case, the sale proceeds in issue approximated the cost of the fixed dollar "annuity" incurred by the trust.[60] Based on the following analysis, we

---

[58]As used in the regulations, "income" refers to income for tax purposes and not to income for trust accounting purposes. Thus, it includes both ordinary income and income allocable to corpus. Sec. 1.671–2(b), Income Tax Regs. Furthermore, in this case the annual payments are chargeable to either income or capital. See art. XII(xi) on p. 620 *supra*.

[59]The amount of the taxable gain will be the difference between the net sale proceeds received by the trust and petitioners' bases in the Teledyne stock. Sec. 1015(b).

[60]In *Archbishop Samuel Trust*, the Court obtained the cost of the fixed dollar annuity from a private insurer. In this case, petitioners based their calculation on tables prepared by the Internal Revenue Service (see sec. 20.2031–10(f), Estate Tax Regs.). The different sources used are not significant for purposes of this opinion.

concluded in *Archbishop Samuel Trust* that the entire sale proceeds were taxable to the taxpayers (pp. 651–652):

We feel that all of the gain on the sale of the scrolls is being accumulated for future distribution to the grantor. The trust received $250,000 upon the sale of the scrolls. This amount less the expenses of the sale constituted the corpus of the trust. * * * The cost of a fixed dollar annuity in 1954 for a male age 47 of $10,000 per year for life, according to the rates of the Massachusetts Mutual Life Insurance Company would have been $202,174 * * *. Generally, this means, assuming a normal life span for Samuel, that it would take $202,174 together with some income therefrom to meet an obligation such as was incurred by the trust. The annuity rates used by the Massachusetts Mutual Life Insurance Company in 1954 were based on a life expectancy of a male age 47 of 28.78 years. Obviously the life expectancy at which costs of annuities are computed are the average. Nevertheless, considered on this basis the entire capital gain of the trust could be considered to be accumulated for future distribution to Samuel. But more important is the fact that there is no guarantee that the trust will produce income in any amount in any year. Broad powers of investment or reinvestment of the trust funds in incorporated or unincorporated enterprises (even though, absent the authority given by the instrument, such investments would be of a character not approved for trust funds) are given to the trustees. The trustees are Samuel, himself, and a nonadverse party. Should the investments of the trust funds be such as to produce little income, the entire amount received for the scrolls could be paid out to Samuel within a period of less than 22 years. Furthermore, all the $10,000 payments out of the trust could be made exclusively from the principal of the trust notwithstanding the fact that the trust had substantial income. Considering all these factors we think it clear that the proceeds from the sale of the scrolls were held in their entirety for future distribution to Samuel.

This analysis is equally applicable to the present situation and we adopt it.[61] As in *Archbishop Samuel Trust v. Commissioner, supra,* the trust instrument before us confers upon the trustee broad investment powers (art. XII (x)) and permits the annual payments to be paid from either income or corpus (art. XII(xi)).

Although petitioners neither had the right to receive[62] nor did receive any payments from the Florcken Trust during the

----

[61]If anything, the facts in the present case are more conducive to the analysis in *Archbishop Samuel Trust.* Whereas the sale proceeds in that case exceeded the cost of the fixed dollar annuity, the sale proceeds in this case were less than the applicable cost. Accordingly, the likelihood of using the entire trust funds to service the annuities are greater in the present case than in *Archbishop Samuel Trust.*

[62]The original June 29, 1972, "annuity" agreement evidently provided for annual payments to commence on June 29, 1973. This agreement was rescinded and replaced with an agreement whereby the first annual payments were not due until September 1975.

years in issue, they are equally taxable on that trust's income and on the gain from the April 16, 1973, sale of the Teledyne stock. The entire trust corpus, i.e., the Teledyne stock and its proceeds, and the income derived therefrom was being "held or accumulated for future distribution" to petitioner. Sec. 677(a)(2); *Archbishop Samuel Trust v. Commissioner*, 36 T.C. at 651–652. However, even if all of the current trust income were not being held for such purpose, the portion which was not being so held would still be taxable to petitioners due to Vera's position as beneficiary of the trust. Sec. 677(a)(1).[63]

To reflect the foregoing,

*An appropriate order will be entered.*

---

[63]Having decided that sec. 677(a) is applicable, we do not address respondent's alternative claims that the trusts' income should be taxable to petitioners pursuant to sec. 674(a) (power to control beneficial enjoyment), sec. 675(1) (power to deal for less than adequate and full consideration), and sec. 675(2) (power to borrow without adequate interest or security).